Filed 7/6/16  P. v. Aguirre CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LUIS ANTONIO AGUIRRE, <br><br> Defendant and Appellant. | H041415 <br> (Santa Clara County <br> Super. Ct. No. C1118723) |

## STATEMENT OF THE CASE

An information charged defendant Luis Antonio Aguirre with 12 counts of aggravated sexual assault of a child under 14 years of age (Pen. Code, § 269; counts 1-12) and 12 counts of forcible lewd acts upon a child (Pen. Code, § 288, subd. (b)(1); counts 13-24).  The named victim in all 24 counts was Kassandra Doe.

The case proceeded to jury trial.  On the motion of the prosecutor, count 4 was dismissed due to insufficient evidence.  The jury convicted defendant on counts 2, 3, 9-13, and 17-24.  For each of counts 14, 15, and 16, the jury found defendant guilty of the lesser included offense of lewd conduct on a child (Pen. Code, § 288, subd. (a)).  The jury acquitted defendant on count 1 and counts 5-8.  The trial court sentenced defendant to a prison term of 90 years to life consecutive to 64 years.

Defendant now appeals from the judgment of conviction. On appeal, defendant argues that we must reverse the judgment due to the admission of his involuntary confession.[1] As set forth below, we will affirm.

## DISCUSSION[2]

Defendant contends that his confession was involuntary, and thus inadmissible, because "the police coerced [his] admissions by insisting his denials were rebutted by scientific proof, by asserting the alleged conduct was understandable and implying he could obtain help by admitting guilt." (Capitalization omitted.) ~(AOB at p. 14)~ He emphasizes that the recent decision in *In re Elias V.* (2015) 237 Cal.App.4th 568 (*Elias V.*) compels the conclusion that his confession was involuntary. As explained below, defendant's confession was not involuntary.

### *Background*

Detective Angel Mina and Detective Tina LaTendresse interrogated defendant on October 26, 2011. At trial, Detective Mina testified that defendant waived his *Miranda*[3] rights before the interrogation. She also testified that she and Detective LaTendresse utilized a "ruse" when they interrogated defendant. She explained that a ruse is a "common" and "accepted" investigative tool in which police provide false information to a suspect in order to "elicit truthful responses." Detective Mina testified that she and

---

[1] The Attorney General contends that defendant forfeited his argument by failing to seek suppression of his confession in the trial court. Defendant contends that, if his argument is deemed forfeited, his counsel rendered ineffective assistance in failing to object to the admission of his confession. Because we can easily resolve defendant's claim on the merits, we will not address the issues of forfeiture and ineffective assistance of counsel.

[2] The facts underlying defendant's conviction are not relevant to our analysis of the issue presented on appeal. We therefore will not summarize those facts.

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

Detective LaTendresse provided the following false information to defendant during the interrogation: 1) the alleged victim, Kassandra, had undergone a physical examination when she was younger; 2) police had medical records from when Kassandra was younger; 3) when a child has sexual intercourse, it causes scarring; 4) Kassandra had scarring due to sexual intercourse as a child; 5) Kassandra kept clothing from when she was a little girl; 6) a sample of defendant's DNA, which was obtained during the interrogation, had been analyzed; and 7) defendant's DNA was on Kassandra's clothing. Detective Mina also testified that she showed defendant a false DNA report during the interrogation. A video of the interrogation was played for the jury.

The interrogation began at 10:13 a.m. At the beginning of the interrogation, Detective Mina and Detective LaTendresse asked defendant general questions about his place of birth, the places he had lived, his job, and his family. The detectives offered defendant food. Detective Mina asked defendant if he had any idea why he being questioned by the police. Defendant responded that he thought it was related to a phone call he recently received from his wife's 19-year-old granddaughter, Kassandra. Officer Mina asked what the phone call was about, and defendant said that Kassandra accused him of "sexual harassment" when she was a child. When the detectives asked defendant what sort of sexual harassment Kassandra alleged, defendant said he never touched Kassandra and explained that when Kassandra was a child she would "jump" on him and "go crazy." When asked if Kassandra was a "good kid" when she was "growing up," defendant responded that he did not like it when Kassandra would sit on his lap and "go crazy all over the place." Defendant also said that Kassandra would "jump all over" him. When Detective Mina asked defendant what he meant by "jump all over," defendant stated that Kassandra would "rub" him and "hug" him.

Defendant asserts that coercive police conduct began after the detectives asked him for a DNA sample. After defendant gave the officers permission to extract a DNA

3

sample from his mouth, Detective LaTendresse told defendant that DNA "can stay on clothing" and "can stay inside the body" for "years." Detective LaTendresse then asked defendant, "Is there any reason why your DNA when we swab you would be somewhere on Kassandra that it should not be?" Defendant responded, "Uh huh. Oh, I don't know. No." Detective LaTendresse then told defendant that Kassandra "had an exam when she was younger," "some things were found," and that was why the police wanted defendant's "swab." Detective LaTendresse informed defendant that Kassandra "kept her clothing when she was a little girl" and then asked defendant if there was "any reason why [his] DNA would be on any of her clothing." Defendant responded, "No, no, no." Shortly after defendant's response, the detectives offered defendant water, coffee, and food, and they gave him a break from questioning. The break occurred at 11:08 a.m.

At 11:12 a.m., the detectives again offered defendant food. They then swabbed the inside of defendant's cheek. After obtaining the swabs, Detective Mina said, "We're gonna drop these off." The detectives left the room at 11:15 a.m.

The detectives resumed questioning defendant at 11:29 a.m. Immediately upon resuming the questioning, Detective Mina asked defendant if he was "okay." Defendant responded, "Yeah." Detective Mina told defendant, "I don't want to be disrespectful to you." Detective Mina reminded defendant that his house had been searched by police, and she informed defendant that there was "enough evidence against" him to search his house and question him. Detective Mina advised defendant "to be honest," and defendant continued to deny touching Kassandra. Detective Mina said to defendant, "I will not listen to anymore lies." Defendant then told the detectives that "sometime" he removed Kassandra's underwear "[f]rom the dirty clothes" and licked them. He explained that he did so because "she used to come and grab and hug me hard."

Detective Mina asked defendant what he did after he licked the underwear, and defendant insisted that he "didn't do anything." Detective Mina said, "I'm in charge

4

now." She advised defendant to "tell the truth," reminded him that the "stuff is at the lab," and informed him that DNA "doesn't go away after a year, two years, five years." Defendant continued to deny touching Kassandra in a sexual manner. Detective Mina accused defendant of lying, informed him that police "seized a bunch of stuff from [his] house," and advised him that he could not "make this go away" because police had his DNA. Defendant again denied touching Kassandra, and he denied any attraction to Kassandra. Detective LaTendresse then stated: "I believe that this is not all your fault. I believe that this—I've seen this young lady. I know she's very attractive. And she probably was very attractive as—girl, okay. And she probably had some curiosities and she may have been interested in you in that way. . . . And I can understand how you could be attracted to her because she probably came on to you, okay. But we understand that. The big thing is, Luis, we just want to know the truth of what happened and why. That's it. We know what happened. But we want you to tell us what happened." Defendant responded by stating that he had not "done anything . . . sexual to her."

Detective Mina reminded defendant about licking Kassandra's underwear, and defendant stated, "That's sick in my mind." Detective Mina told defendant that DNA "[i]n the mouth" is "[n]ot the same." Defendant responded that he "didn't do sex to her." He then stated that Kassandra sat on his lap in the jacuzzi, she did "a lot of crazy stuff," and semen "might" have leaked from his penis. Detective LaTendresse told defendant to "get it off [his] chest." Defendant responded that Kassandra was "attractive" and "[s]he go crazy." Defendant stated that he was "so stupid," but he continued to insist that he "didn't do her sexual." When Officer Mina asked defendant what he had done, defendant stated that Kassandra sat in his lap and tried to grab his "thing." He emphasized that he never "penetrate[d]" Kassandra. When Detective LaTendresse asked if he ever put his penis inside Kassandra's vagina, defendant stated, "No, never, no."

5

Detective LaTendresse told defendant that "there was some type of contact" between his penis and Kassandra, and Detective LaTendresse asked defendant to explain "what it was." Detective LaTendresse told defendant to "[j]ust be honest." Defendant admitted that he put his leg on top of Kassandra's legs, and his penis "was leaking through" his underwear. He stated, "[I]t might be some DNA because I was leaking." He continued to emphasize, however, that he "didn't sexual her." Detective Mina informed defendant that his wife saw him rub his penis against Kassandra, and Detective Mina asked defendant if his wife was lying. Defendant stated that Kassandra "went crazy" on his leg "like she was doing sex." Defendant also stated that Kassandra would "go on top" of his penis when he was clothed and do "horsy riding."

The detectives then showed defendant an envelope, and Detective Mina said, "This is the DNA stuff." The detectives accused defendant of penetrating Kassandra, explaining that the "lab results" showed that Kassandra had vaginal scarring "from when she was younger." Defendant denied penetrating Kassandra with his penis or his finger. Detective Mina said that defendant's semen was found inside Kassandra's vagina. Defendant stated that he "didn't penetrate her." Detective Mina told defendant, "[T]here's DNA from your fingers insider her too." Defendant denied touching Kassandra with his hands. Detective Mina accused defendant of lying. Defendant repeatedly denied penetrating Kassandra.

The detectives offered defendant coffee and water. They gave defendant a break from questioning at 12:34 p.m.

The detectives resumed questioning defendant at 1:13 p.m. Detective Mina asked defendant if he tried to get Kassandra to perform oral sex. Defendant said, "No." Detective LaTendresse then advised defendant that she and Detective Mina were going to ask him some questions to "make sure" the detectives "didn't disrespect" defendant during the interrogation. The detectives asked defendant how he felt when they accused

6

him of lying, and defendant stated that he felt "relief in [his] chest." Detective LaTendresse asked defendant, "Were we respectful to you?" Defendant responded, "Oh, no, no, no, no. No, you do your job. You did a great job." Detective LaTendresse then asked, "We treated you okay?" Defendant replied, "Oh, yeah. . . . Everything good." The interrogation ended at 1:42 p.m.

### Defendant's Confession was Not Involuntary

"The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession." (*People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*). "A confession is involuntary if it is the result of coercive police activity." (*People v. Mays* (2009) 174 Cal.App.4th 156, 164.)

Courts "apply a 'totality of circumstances' test to determine the voluntariness of a confession." (*Massie, supra,* 19 Cal.4th at p. 576.) The totality of the circumstances test looks at "the nature of the interrogation and the circumstances relating to the particular defendant." (*People v. Dykes* (2009) 46 Cal.4th 731, 752.) "Among the factors to be considered are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' [Citation.]." (*Massie, supra,* 19 Cal.4th at p. 576.)

"Police trickery that occurs in the process of a criminal interrogation does not, by itself, render a confession involuntary . . . . [Citation.] Why? Because subterfuge is not necessarily coercive in nature. [Citation.] And unless the police engage in conduct which coerces a suspect into confessing, no finding of involuntariness can be made. [Citations.]" (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280 (*Chutan*).) "So long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence.

7

[Citations.] Police officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating such tactics are legion." (*Ibid.*, italics in original.)

" 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . ." ' [Citations.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).)

On appeal, the voluntariness of a confession is subject to independent review. (*Massie, supra,* 19 Cal.4th at p. 576.) "In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*Ibid.*)

Here, we cannot conclude that defendant's will was overborne by police coercion. Defendant's major argument regarding involuntariness centers on the detectives' lies about DNA evidence. Defendant emphasizes that, through the detectives' misrepresentations regarding DNA, he "was manipulated" into providing damaging admissions, "regardless of his guilt or innocence." This argument is unconvincing. The record shows that the detectives' misrepresentations regarding DNA were "not of a kind likely to produce a false confession." (*Chutan, supra,* 72 Cal.App.4th at p. 1280, italics

8

omitted.) Although the detectives' lies about DNA may have influenced defendant to admit licking Kassandra's underwear and to admit that his penis was "leaking," the detectives' comments about DNA were insufficient to procure more serious admissions from defendant. The detectives repeatedly tried to get defendant to confess to penetrating Kassandra's vagina with his penis or his finger, and defendant repeatedly denied any sort of penetration. Despite the detectives' assertions that the DNA evidence demonstrated penetration, defendant insisted throughout the entire interview that he had never penetrated Kassandra. If the detectives' misrepresentations regarding DNA were as powerful as defendant claims they were, those misrepresentations would have prompted defendant to confess to penetration, regardless of whether or not he penetrated Kassandra. Defendant's "resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*People v. Coffman* (2004) 34 Cal.4th 1, 58.) We must conclude that the ruse utilized by the detectives was not coercive, and the ruse did not render defendant's admissions involuntary.

Defendant also asserts that Detective LaTendresse's use of a "minimization tactic" rendered his admissions involuntary. Specifically, defendant contends that when Detective LaTendresse described Kassandra as "very attractive," suggested that Kassandra "probably had some curiosities," and posited that Kassandra "came on to" defendant, she made an implied promise of leniency that coerced defendant's admissions. This argument is not persuasive. We see nothing in Detective LaTendresse's comments that constituted a promise of leniency. Nothing in Detective LaTendresse's comments improperly suggested that defendant " ' "might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement. " ' " (*Holloway, supra,* 33 Cal.4th at p. 115.) Rather, Detective LaTendresse's comments were brief and isolated, and they simply conveyed to defendant

9

a possible excuse for his conduct. Detective LaTendresse's "minimization tactic" did not render defendant's admissions involuntary.

Finally, defendant's reliance on *Elias V., supra,* 237 Cal.App.4th 568 is unavailing. In *Elias V.*, the First District Court of Appeal applied the totality of the circumstances test and concluded that 13-year-old Elias's confession was involuntary. The court explained: "Our finding that Elias's statements were involuntary is based on a combination of factors: (1) Elias's youth, which rendered him ' "most susceptible to influence," [citation], and "outside pressures," [citation]' [Citation.]; (2) the absence of any evidence corroborating Elias's inculpatory statements; and (3) the likelihood that [the interrogating officer's] use of deception and overbearing tactics would induce involuntary and untrustworthy incriminating admissions." (*Elias V., supra,* 237 Cal.App.4th at pp. 586-587.) The court repeatedly emphasized Elias's youth in concluding that his confession was involuntary. (*Id.* at pp. 581, 587-591, 593, 595-596, 597.) Here, defendant was 51 years old at the time of his interrogation, not a 13-year-old child. Children are "much more vulnerable" in dealings with police than "resilient" adults. (*Id.* at p. 588.) Defendant's age makes this case distinguishable from *Elias V.*, and *Elias V.* does not compel us to conclude that defendant's confession was involuntary.

Moreover, unlike *Elias V.*, we believe that the totality of the circumstances here demonstrate that defendant's confession was voluntary. Detective Mina and Detective LaTendresse made no threats or promises during the interrogation. The interrogation was not unduly lengthy, and the detectives gave defendant breaks from questioning. The detectives made an effort to make defendant comfortable, offering defendant food and beverages at many points during the interrogation, asking defendant whether he was "okay," and informing defendant that they did not intend to be "disrespectful" to him. At 51 years old, defendant had the maturity to freely decide whether to confess. Although the detectives made misrepresentations regarding DNA evidence and accused defendant

10

of lying during the interrogation, the record suggests that defendant was not uneasy—he laughed during portions of the questioning, he affirmed that the detectives treated him "okay," and he stated that the detectives "did a great job" during the interrogation. On this record, we cannot conclude that defendant's will was overborne by police coercion, and we must conclude that defendant's confession was voluntary.

In sum, defendant's arguments regarding involuntariness are not persuasive. Defendant's confession was voluntary, and reversal due to the admission of the confession is unwarranted.

## DISPOSITION

The judgment is affirmed.

_____
                       RUSHING, P.J.

WE CONCUR:

_____
           PREMO, J.

_____
          MÁRQUEZ, J.

*People v. Aguirre*
**H041415**